DOWD, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Denise Shane, et al., | ) | |
| | ) | CASE NO. 3:03 CV 7721 |
| Plaintiff(s), | ) | |
| | ) | |
| v. | ) | MEMORANDUM OPINION |
| | ) | AND ORDER |
| Dlubak Glass Company, et al., | ) | |
| | ) | |
| Defendant(s). | ) | |
| | ) | |

Before the Court is the motion for summary judgment filed by defendant Dlubak Glass

Company.  (Doc. No. 31).[1]  Plaintiffs have filed a response (Doc. No. 39) and defendant filed a reply

(Doc. No. 42).[2]  For the reasons set forth below, the motion for summary judgment (Doc. No. 31) is

granted as to Dlubak Glass Company.

## I.  BACKGROUND

On December 4, 2003, plaintiffs Denise Shane ("Shane" or "plaintiff") and her husband Jerry

Shane (collectively, "plaintiffs") filed this lawsuit based on diversity jurisdiction.  On June 24, 2004, the

_____

[1]  There is a second defendant, Dlubak Fabricating, Inc. ("Dlubak Fabricating"), previously identified as "John Doe Company 1," who does not appear to have joined in this motion.

[2]  In addition, Dlubak has filed a motion to strike the affidavit of Gerald C. Rennell, plaintiff's "inconsistent deposition testimony as to how she was injured[,]" and any evidence of subsequent remedial measures taken by Dlubak.  (Doc. No. 43).  Plaintiff has opposed this motion.  (Doc. No. 44).  The motion to strike is denied for purposes of this summary judgment motion, without prejudice to the raising of these same evidentiary issues at such time as the case goes to trial.

(3:03 CV 7721)

First Amended Complaint was filed.  Plaintiffs allege that, on January 25, 2002, while Shane was

engaged in the performance of her duties as an employee of Dlubak Glass Company ("Dlubak" or

"defendant") in Upper Sandusky, Ohio, she was injured by a conveyor belt.  In Count One, plaintiffs

allege an intentional tort on the part of Dlubak.  In Count Three they assert a strict product liability claim

against Dlubak and/or defendant Dlubak Fabricating alleging that one or both of these defendants

defectively designed, manufactured and assembled the conveyor belt system on which Shane worked

and that they failed to warn her of the danger.  In Count Four, plaintiffs assert the same product defect

and failure to warn claims under a negligence theory.  In Count Two, Jerry Shane asserts loss of

consortium.

Dlubak is in the business of recycling glass.  At the plant where plaintiff worked in Upper

Sandusky, Ohio,[3] there was a system of inclined conveyor belts, running at different heights, which

moved glass into and around the plant, sending it through a series of crushers and shakers and past

employees known as "line pickers" who removed trash and other objects from the glass in order to

prepare it for recycling.  At the terminal end of each conveyor belt, there was a device known as a "tail

pulley" which was responsible for the return rotation of the belt.  By Shane's own admission,

employees were instructed to stay away from the tail pulleys because they can cause significant injury.

There were guards installed over the tail pulleys to prevent anyone from inserting their hand or anything

_____

[3]  Shane was hired as a laborer in June 1998.  At the plant, there were several laborer
positions: machine operator, line picker, fork lift operator, high lift operator, and CRT handler.

2

(3:03 CV 7721)

else.  When a tail pulley needed to be cleaned[4] or repaired, Dlubak employed a "lock-out/tag-out"

policy whereby the line would be shut down and locked to prevent accidental startup and injury to a

worker.  Also, before the line was ever started up, a loud buzzer was sounded as a warning.

There were two lines in the Upper Sandusky facility: the plate line and the lamination line.  On

the latter, called the "lam line" by the employees, laborers called "line pickers" stood at stations on

small raised platforms located on one side of the three-foot wide conveyor belt and removed trash

(such as pop cans, wire or paper) from broken windshield glass as it passed by on the belt.  Although

the ultimate goal on the lam line was to separate the glass and vinyl components of discarded

windshields, Shane's particular duty on the day of her injury was to remove only trash, not vinyl.  It was

typical for glass pieces to fall off the belt; therefore, it was also the job of the line pickers to sweep the

fallen glass and shovel it back onto the conveyor belt whenever there was no product passing by on the

belt.  It is undisputed that this was typically done while the conveyor belts were moving.  When the line

was stopped during regular breaks and lunch times, the workers could empty their trash bins.

On January 25, 2002, plaintiff's direct supervisor, plant manager Andrea Thiel ("Thiel")

assigned plaintiff to work the lam line along with Cora Derr, Karen Castanien and Virginia Luikart.

Derr was assigned to operate the machinery from the control room above the plant floor, from which

the line could be started and stopped.[5]  Just before her break, plaintiff noticed a vinyl strip hanging from

---

[4]  At his deposition, David Dlubak explained that, in fact, the tail pulleys were of the "self-cleaning" variety so they rarely had be be cleaned.  (Dlubak Dep. at 12).

[5]  There were also emergency stop switches near the line and a cord that ran along the

(continued...)

3

(3:03 CV 7721)

on or near the tail pulley on her conveyor belt.  While the conveyor belt was moving, plaintiff grabbed

the piece of vinyl, attempting to remove it, even though her only job was to pick trash, not vinyl, out of

the glass passing by on the belt.  Shane's right hand and arm were pulled into the conveyor belt.  No

one saw what happened because the other workers were not nearby and plaintiff herself remembers

little of the incident, except that she tried to remove a vinyl strip.  When Derr heard Shane scream, she

quickly used the emergency button to shut down the line and then hurried to help Shane get to the

office.  The office receptionist, Delaina Brenson, drove plaintiff to the emergency room.  From there she

was transported by helicopter to a hospital in Columbus, Ohio.  Plaintiff suffered what is known as a

degloving injury; she has had five surgeries on her right hand and has been unable to return to work,

although she is receiving vocational rehabilitation.

Plaintiff asserts that the guard that was supposed to be on the tail pulley was either not attached

properly or was on the floor at the time of her accident, but she is not certain.  She states that in all the

time she worked at Dlubak, the only time she ever remembers a guard being off was when she was

injured.  John Burka, a co-worker, testified that he saw the guard on the tail pulley on the morning of

the accident; he claims that it was affixed with four bolts.  Cora Derr testified that, after the accident,

she went back to look at the conveyor belt and she noticed that the tail pulley guard was bolted on,

"but it was flipped back."  (Derr Dep. at 24).

---

[5] (...continued)
conveyor belts which could be pulled to stop the line.

4

(3:03 CV 7721)

Since the time of plaintiff's accident, the relevant tail pulley guard has been replaced.  Dave Dlubak testified that this was done as part of routine maintenance that was already underway prior to Shane's accident.[6]  According to him, it was not a result of the accident.  Unfortunately, it does not appear that anyone took photographs to document the condition of the machinery, not even immediately after the accident.[7]  Thiel did complete a form called a "supervisor's accident investigation report," which seems to have been done several days after the accident and was for Workers Compensation purposes.  Dlubak also employed an independent contractor, Kevin Exstein, as a safety representative; but he does not appear to have had any involvement with this accident, nor did he conduct any investigation of the accident.

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56 .  When considering a motion for summary judgment, "the inferences to be drawn from the underlying facts contained in [affidavits, pleadings, depositions, answers to interrogatories, and admissions] must be viewed in the

---

[6]  Dlubak would have the Court not consider these subsequent remedial measures.  However, the Court has not given particular significance to these repairs in considering the summary judgment motion and concludes that the remedial measures are, at the very least, a part of the fact pattern of the case.

[7]  A "preliminary report" submitted by plaintiffs' expert, Bradford D. Zelasko, was attached to plaintiffs' response to the motion.  This report suggests that photographs were taken by a "Workers' Compensation investigator;" however, no one has supplied these pictures to the Court.

(3:03 CV 7721)

light most favorable to the party opposing the motion." <u>U.S. v. Diebold, Inc.</u>, 369 U.S. 654, 655

(1962).  However, the adverse party "may not rest upon mere allegation or denials of his pleading, but

must set forth specific facts showing that there is a genuine issue for trial." <u>Anderson v. Liberty Lobby,</u>

<u>Inc.</u>, 477 U.S. 242, 256 (1986).

 The Rule requires the nonmoving party who has the burden of proof at trial to oppose a proper

summary judgment motion "by any of the kinds of evidentiary material listed in Rule 56(c), except the

mere pleadings themselves[.]" <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 324 (1986).  General

averments or conclusory allegations of an affidavit do not create specific fact disputes for summary

judgment purposes.  <u>See</u> <u>Lujan v. National Wildlife Federation</u>, 497 U.S. 871, 888-89 (1990).  Nor

may a party "create a factual issue by filing an affidavit, after a motion for summary judgment has been

made, which contradicts . . . earlier deposition testimony." <u>Reid v. Sears Roebuck & Co.</u>, 790 F.2d

453, 460 (6th Cir. 1986) (citing <u>Biechell v. Cedar Point, Inc.</u>, 747 F.2d 209, 215 (6th Cir. 1984)); <u>but</u>

<u>see</u> <u>Baer v. Chase</u>, 392 F.3d 609, 623-26 (3d Cir. 2004) (noting that a so-called "sham" affidavit need

not be disregarded if there is "independent evidence in the record to bolster [the] otherwise

questionable affidavit").  Further, "'[t]he mere existence of a scintilla of evidence in support of the

plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for

the plaintiff.'" <u>Street v. J.C. Bradford & Co.</u>, 886 F.2d 1472, 1477 (6th Cir. 1989) (quoting

<u>Anderson v. Liberty Lobby</u>, 477 U.S. at 252).

 In sum, "[t]he inquiry performed is the threshold inquiry of determining whether there is the

need for a trial -- whether, in other words, there are any genuine factual issues that properly can be

6

(3:03 CV 7721)

resolved only by a finder of fact because they may reasonably be resolved in favor of either party."

Anderson v. Liberty Lobby, 477 U.S. at 250.  Put another way, this Court must determine "whether

the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-

sided that one party must prevail as a matter of law."  Id. at 251-52.  See also Wexler v. White's Fine

Furniture, Inc., 317 F.3d 564, 578 (6th Cir. 2003) ("[t]he conflicting proof and the inferences that can

be drawn therefrom raise genuine issues of material fact that preclude the grant of summary judgment").


### III.  DISCUSSION

### A.  Count One -- Employer's Alleged Intentional Tort

Ordinarily, an employee is compensated for workplace injuries through the Workers'

Compensation system.  However, an employer can be liable in damages for intentional torts.  The Ohio

Supreme Court has set forth the elements which a plaintiff must prove to prevail on an intentional tort

claim against her employer:

> [I]n order to establish "intent" for the purpose of proving the existence of an intentional
> tort committed by an employer against his employee, the following must be
> demonstrated: (1) knowledge by the employer of the existence of a dangerous process,
> procedure, instrumentality or condition within its business operation; (2) knowledge by
> the employer that if the employee is subjected by his employment to such dangerous
> process, procedure, instrumentality or condition, then harm to the employee will be a
> substantial certainty; and (3) that the employer, under such circumstances, and with
> such knowledge, did act to require the employee to continue to perform the dangerous
> task.

7

(3:03 CV 7721)

Fyffe v. Jeno's, Inc., 59 Ohio St.3d 115 (1991), syllabus ¶ 1 (modifying Van Fossen v. Babcock & Wilcox Co., 36 Ohio St.3d 100 (1988), syllabus ¶ 5).  The burden of proof as established by Fyffe is high:

> To establish an intentional tort of an employer, proof beyond that required to prove negligence and beyond that to prove recklessness must be established. Where the employer acts despite his knowledge of some risk, his conduct may be negligence. As the probability increases that particular consequences may follow, then the employer's conduct may be characterized as recklessness.  As the probability that the consequences will follow further increases, and the employer knows that injuries to employees are certain or substantially certain to result from the process, procedure or condition and he still proceeds, he is treated by the law as if he had in fact desired to produce the result.  However, the mere knowledge and appreciation of a risk-- something short of substantial certainty--is not intent.

Fyffe, supra, syllabus ¶ 2 (modifying Van Fossen, supra, syllabus ¶ 6).

Defendant argues that Shane cannot establish any of the three elements of a claim of intentional tort.  In particular, Dlubak argues that plaintiff was not required to clean items from in or around the tail pulley, that she was, in fact, prohibited from doing so, and that she was not supposed to be removing vinyl in any event.  It argues that there is no evidence that the appropriate guard was missing from the tail pulley and that, even if it were missing, there is no evidence that Dlubak knew it was missing and/or required plaintiff to work despite a missing guard.

In response, plaintiffs argue that knowledge of the danger to Shane can be inferred from Dlubak's general practice of requiring line pickers to leave their stations and clean around moving conveyor belts despite the known danger presented by moving machine parts.  However, the mere fact that there is *generally* danger from moving machine parts is not enough to establish an intentional tort.

8

(3:03 CV 7721)

In Van Fossen, the Ohio Supreme Court required an employer to have "actual knowledge of the exact dangers which ultimately caused [the injury]."  36 Ohio St.3d at 112.

Here, the "exact danger[ ]" claimed by Shane is not so much that the machine was moving but that the guard on the tail pulley was missing or improperly installed.  Presumably, had the guard been there and properly installed, injury would not have resulted even if the machine were moving because the guard would have prevented Shane's hand from being pulled into the machine.[8]  There is no question that a missing or defective guard on a tail pulley would constitute a dangerous condition almost certain to cause injury.  However, whether or not the guard was in place cannot actually be determined from the record.  Plaintiff's own testimony is unclear:

> Q.     Did you notice if the guard on that tail pulley was on?
> A.     It was not on, no.  It was not attached properly, no.
> Q.     Okay.  Was part of it attached?
> A.     I'm not sure.  I was thinking it on was [sic] the floor but I'm not sure.

(Shane Dep. 53).  Plaintiff argues that, because Cora Derr admitted that she never checked the machinery prior to starting it up on the day of Shane's injury, the Court must infer that the guard was not properly in place.  However, a co-worker, John Burka, claims that he noticed the guard on the tail pulley on the morning of the accident, although he cannot say for certain it was still there at the time of the accident.  He testified:

> Q.     Do you know anything about whether or not there was a guard on the
>          tail pulley where Denise Shane got hurt?

---

[8]  Although one might presume, from the fact that Shane was injured, that the guard must not have been properly in place, that presumption (based on a theory of *res ipsa loquitur*, which infers negligence) would be inapplicable on an intentional tort claim.

9

(3:03 CV 7721)

> A.     Yes, there was.
> Q.     Was the guard on at the time of her injury, if you know?
> A.     I don't know but it was on the morning I walked in because the lunchroom is right beside it, and that's where we usually go to put our lunches away.
> Q.     So you're talking about the morning before the injury?
> A.     Yes.

(Burka Dep. 17).  Christopher Leighty, who worked in maintenance at the plant, testified that guards were sometimes take off for maintenance.  (Leighty Dep. 20).  He also stated that he was "constantly" being called to repair guards on tail pulleys because "[t]hey get bumped into, backed into with forklifts, bolts get busted off, welds break."  (Id. 33).  Therefore, it is possible that the guard could have <u>both</u> been on the tail pulley at the start of the day and broken off or displaced by the time of the accident. After Shane's injury, Leighty went to look at the tail pulley which injured her and "saw the guard flipped backwards away from covering the tail pulley."  (Id. 34).  He characterized it as being "opened like a bread box."  (Id. 35).[9]  Virginia Luikart, who was working on the same crew as Shane on the day of the accident, testified that she also looked at the guard after the accident and, although it was on, "it was down," and "wasn't actually pulled up to where it should have been in position."  (Luikart Dep. 40).  Unfortunately, whether the guard was on or not, and whether it was properly positioned or not, will never be known because no one saw the accident and Shane does not really remember the details. This is a fact that is simply not ascertainable from the record before the Court.

---

[9]  He also indicated that he saw a piece of vinyl on the tail pulley and he theorized that the guard might not have been properly positioned because Shane herself had moved it.  (Leighty Dep. 36).  Of course, this is all conjecture.

10

(3:03 CV 7721)

However, even assuming for the sake of argument that the guard was <u>not</u> on the tail pulley, plaintiffs would also have the burden of proving that the employer knew of the dangerous condition. The mere fact that guards were sometimes knocked off and in need of repair is not enough to establish knowledge on the part of the employer that the particular guard was missing at the time of the accident. No one had reported a need for repair of that particular guard.  As already noted, it is entirely possible that, even if the guard was bent upwards as Leighty and Luikart described, it could have been damaged sometime between the start of the day and the time of Shane's injury.  Therefore, Shane cannot establish either the first or second element of the <u>Fyffe</u> test.

Finally, Shane also cannot show the third element of the <u>Fyffe</u> test.  To establish this element, an employee does not have to show a direct order from the employer; rather, this element can be satisfied "by presenting evidence that raises an inference that the employer, through its actions and policies, required the employee to engage in the dangerous task."  <u>Gibson v. Drainage Prods., Inc.</u>, 95 Ohio St. 3d 171, 177 (2002).  Shane herself admitted that she would never have been forced to work in known unsafe conditions and that she had absolutely no reason to believe that her employer was indifferent to workplace safety  conditions.  She testified:

> Q.    Do you think that Mr. Dlubak, Dave, would ever ask you to do something where it would put you in peril, put you in a dangerous situation?
> A.    No.
> Q.    Do you think he would ever require you to do something where an injury was virtually certain to occur?
> A.    No.
> Q.    Do you think Andy [Thiel] would have ever done that?
> A.    You wouldn't think so.

11

(3:03 CV 7721)

> Q.    Do you think Andy would have ever required you to do something
>       where you were certain to be injured?
> A.    No.
> Q.    Do you think Andy would have ever required you to do something
>       where an injury was virtually certain to occur?
> A.    No.

(Shane Dep. 57-58).  There is nothing in this record to suggest that, had Dlubak known about a missing

guard on a tail pulley (which cannot be established), it would nonetheless have demanded that plaintiff

continue working despite the dangerous condition.

Notwithstanding the significant injury that Shane suffered, she cannot prove that her employer

committed an intentional tort which caused that injury.  Dlubak is entitled to judgment on Count One

and, to that extent, the motion for summary judgment is granted.

**B.  Count Three -- Product Liability; Count Four -- Negligent Failure to Warn**

These two counts are based on essentially the same facts, but different legal theories.

In Count Three, a strict products liability claim, plaintiffs allege that the conveyor belt system

"which was designed, manufactured and assembled by . . . Defendant Dlubak Fabricating and/or

Defendant Dlubak and which system was further distributed, supplied and/or sold by Defendant[ ]

Dlubak Fabricating" (First Am. Cmplt. ¶ 25) was defective "in its design, manufacture and

construction" (id. ¶ 26) and also defective "due to inadequate warning and/or inadequate instruction"

(id. ¶ 27).

12

(3:03 CV 7721)

In Count Four, a products liability claim sounding in common law negligence, plaintiffs allege that Dlubak and/or Dlubak Fabricating were "negligent in the design, manufacture and assembly of the subject conveyor belt system and/or were negligent in failing to adequately warn and instruct Plaintiff Denise Shane and other foreseeable users of the subject product of the dangers involved in the use of said conveyor belt system."  (Id. ¶ 31).

Dlubak argues that Counts Three and Four are barred by the immunity from suit inherent in the workers' compensation system and that these counts are not saved by any application of the "dual capacity doctrine."

The dual capacity doctrine, first recognized in Guy v. Arthur H. Thomas Co., 55 Ohio St.2d 183 (1978), is a narrow exception to the general rule of employer statutory immunity in negligence suits brought by employees.  Under the dual capacity doctrine, " 'an employer normally shielded from tort liability ... may become liable in tort to his own employee if he occupies ... a second capacity that confers on him obligations independent of those imposed as employer.' "  Freese v. Consolidated Rail Corp., 4 Ohio St.3d 5, 8 (1983) (citation omitted).  To fall within this doctrine, " 'the employer must step outside the boundaries of the employer-employee relationship, creating separate and distinct duties to the employee; the fact of injury must be incidental to the employment relationship.' "  Schump v. Firestone Tire & Rubber Co., 44 Ohio St.3d 148, 152 (1989) (citation omitted).  If the injury is caused predominantly by the employment relationship and not by an independent relationship, the doctrine of dual capacity is inapplicable.  Bakonyi v. Ralston Purina Co., 17 Ohio St.3d 154, 157-58 (1985).

13

(3:03 CV 7721)

Although plaintiffs concede that the dual capacity doctrine would not apply with respect to Dlubak, they assert that, in answers to interrogatories, defendants identified Dlubak Fabricating as the manufacturer of the machinery which injured Shane.  According to plaintiffs, Dlubak Fabricating is a separate entity, not Shane's employer, and can be liable for strict product liability and for product liability sounding in negligence.

Of course, Dlubak Fabricating has not joined in the instant motion for summary judgment. However, in the reply brief, Dlubak argues that Andrea Thiel mistakenly identified Dlubak Fabricating as the manufacturer.  Dlubak claims that David Dlubak, who identified himself as "one of the owners" of Dlubak (Dlubak Dep. at 5),[10] testified at his deposition and confirmed by way of affidavit, that Dlubak, not Dlubak Fabricating manufactured the conveyor belt for Dlubak's own use not for public sale.  Therefore, on the strength of Dlubak's testimony, Dlubak wants Counts Three and Four dismissed, presumably as to both Dlubak and Dlubak Fabricating.

Clearly there is no way that the dual capacity doctrine applies.  Dlubak did not occupy two independent relationships with respect to Shane.  In fact, Shane concedes that point.  Therefore, the Court concludes that, although there is a factual dispute as to the identity of the manufacturer of the conveyor belt, it is not material because, if it turns out that Dlubak was the manufacturer, plaintiffs could

_____

[10]  Of course, Dlubak cannot be an "owner" of a corporation.  Even if he owns 100% of the shares, he cannot properly be characterized as an "owner;" rather, he is a "shareholder."

14

(3:03 CV 7721)

not maintain Counts Three and Four against Dlubak.  Therefore, as to Dlubak, summary judgment is

appropriate on Counts Three and Four notwithstanding the factual dispute.[11]

---

[11]  Since Dlubak Fabricating has not joined in the summary judgment motion, Counts Three and Four must survive as to that defendant.  If it turns out that Dlubak Fabricating is the manufacturer, Counts Three and Four could be asserted against that defendant because it was not Shane's employer. The dual capacity doctrine would not be an issue with respect to this defendant.

That having been said, the Court is not certain that these claims would have survived had Dlubak Fabricating moved for summary judgment as the alleged manufacturer.  It is not clear that, for the defective product claim, Dlubak Fabricating could be considered a true "manufacturer" or that the conveyor belt system would be considered a true "product" within the meaning of Ohio's products liability statute since the system was made solely for use by Dlubak.  There is no evidence that the system was in any way mass-produced for sale to the public or put into the stream of trade or commerce.  The Court also has significant doubts about the strength of any failure to warn claim since the danger appears to have been open and obvious, rendering moot any duty to warn.  See Crislip v. TCH Liquidating Co., 52 Ohio St.3d 251, 256-257 (1990) (determining that the duty imposed upon a manufacturer in a strict liability action for failure to warn is the same as that imposed upon the manufacturer in a negligence action for failure to warn); see also Restatement (Second) of Torts §§ 388 and 402A (1965); O.R.C. § 2307.71 et seq.

Since there has been no motion made by Dlubak Fabricating, the Court need not decide these issues.

15

(3:03 CV 7721)

## IV.  CONCLUSION

For the reasons set forth above, the motion for summary judgment filed by defendant Dlubak

Glass Company is granted.  Only Counts Two, Three and Four survive and only against Dlubak

Fabricating, Inc.

IT IS SO ORDERED.

  April 29, 2005                        *s/ David D. Dowd, Jr.*       
Date                                           David D. Dowd, Jr.
                                              U.S. District Judge